### AMY v. SHELBY COUNTY.

### [See Case No. 345.]

### AMY, (UNITED STATES v.)

### [See United States v. Amy, Case No. 14,445.]

## Case No. 341.

### The AMY WARWICK.

### [2 Spr. 123;[2] 24 Law Rep. 335.]

District Court, D. Massachusetts. April, 1862.[3]

PRIZE COURTS—JURISDICTION — CIVIL WAR—BELLIGERENTS — ENEMY'S COUNTRY — BLOCKADE—POWERS OF PRESIDENT.

1. The district courts of the United States are permanent prize tribunals, and take cognizance of questions of prize by virtue of their general jurisdiction.

2. Prize courts are subject to the instructions of their own sovereign. In the absence of such instructions, their jurisdiction and rules of decision are to be ascertained by reference to the known powers of such tribunals, and the principles by which they are governed under the public law and the practice of nations.

3. The United States may be engaged in war, and have all the rights of a belligerent, without any declaration by congress. In such a war, it would be the duty of the president to exert all his powers as commander-in-chief of the army and navy to capture or destroy the enemy. And if, under his instructions, an enemy's ship should be taken and sent in for adjudication, the prize court must proceed to decide the question of prize upon the principles of public law.

[See note at end of case.]

---

[1][Reported by Hon. William Cranch, Chief Judge.]

[2][Reported by Hon. Richard H. Dana, Jr., and here reprinted by permission.]

[3][Affirmed by circuit court, (decree nowhere reported; opinion not now accessible.) Affirmed by supreme court sub nom. The Prize Cases, 2 Black, (67 U. S.) 635.]

4. The hostilities which were commenced, and have been prosecuted, by the rebel confederates against the United States, constitute war in the legal and constitutional sense of that term.

[See note at end of case.]

5. In this war, the rebels are, at the same time, belligerents and traitors, and subject to the liabilities of both. The United States sustains the double character of a belligerent and sovereign, and has the rights of both. The temporary non-user of any such rights is not a renunciation of them, but they may be called into practical exercise at pleasure. The United States has full belligerent rights, which are in no degree impaired by the fact that their enemies owe allegiance, and have added the guilt of treason to that of unjust war.

[Cited in Miller v. U. S., 11 Wall. (78 U. S.) 307.]

[See note at end of case.]

6. If a hostile power, either from without or within our territory, shall make formidable war upon the United States, the president is bound to use the army and navy to carry on the war effectively against such an enemy. He may do so in the manner, and by the measures, usual in modern civilized warfare. One of the most familiar of these is the capture of an enemy's property, public and private, on the ocean.

7. The statute of 1807, c. 39, authorizes the president to employ the army and navy to suppress an insurrection. The manner in which they are to be used is left to the discretion of the president, guided by the usages and principles of civilized war. These, undoubtedly, authorize the capture of enemy's property at sea.

[See note at end of case.]

8. What is enemy's property is a judicial question. Residence of the owner in the enemy's country may be of such a character as to stamp property conclusively as hostile. The court may be compelled to decide what shall be deemed enemy's country.

[Cited in Keppel's Adm'rs v. Petersburg R. Co., Case No. 7,722.]

[See note at end of case.]

9. Richmond, in Virginia, held to be enemy's country, and property captured on the ocean belonging to a permanent resident of that place, to be lawful prize.

[See note at end of case.]

10. In establishing the blockade, the president exercised a great belligerent right. He could not prohibit or restrict the commerce of any state by a mere municipal regulation. The blockade, and the orders of the president to the navy, by which captures have been made, have been confirmed by congress by Stat. 1861, c. 63. This has the force of instructions to prize tribunals to regard those proceedings of the president as legal and valid.

[See note at end of case.]

11. The president, as commander-in-chief, may instruct the officers of the navy to capture, or to abstain from capturing, certain vessels or cargoes. The statute of 1861, c. 28, adds to the means of the president, but in no degree detracts from his previous authority to treat persons or property as he shall deem best.

12. The proviso in the 24th section of the crimes act of 1790, c. 9, and the analogous provision in the constitution, art. 3, § 3, do not preclude the government from having a forfeiture or condemnation of property, at least in cases where the owner has not been convicted of treason.

13. The acts of congress, passed in the summer of 1861, were intended to make the prosecution of the war more efficient, and, in no degree, to curtail the authority which the pres-

ident previously possessed. The previous right of belligerent capture at sea is left unimpaired.

[Cited in The Ambrose Light, 25 Fed. 425, 431.]

[In admiralty. Libel in rem against the brig Amy Warwick and cargo, as prize of war. The vessel sailed from Rio Janeiro, May 29, 1861, with a cargo of coffee, destined to Hampton Roads for orders. By her charter party she was to go either to Richmond, New York, Philadelphia, or Baltimore. She was captured August 10, 1861, by the United States ship of war Quaker City, and brought into this district for condemnation. Robert Edmond, Isaac Davenport, Jr., and James Blair, trading as Edmond, Davenport & Co. at Richmond, Va., through their New York agents, claimed 400 bags of coffee, a portion of the cargo. Property condemned.

[The brig was claimed by David Currie and others, and the balance of the cargo by Dunlop, Moncure & Co., all of Richmond. These claims were dismissed, (the former decree unreported, the latter reported sub nom. The Amy Warwick, Case No. 342.) Another claim was filed by J. L. Phipps & Co., an English house at Rio Janeiro, for an advance made to supply a deficit of funds to purchase the cargo. This claim was allowed. The Amy Warwick, Id. 343. On appeal to the circuit court, the decrees of the district court were duly affirmed, (nowhere reported, opinion not now accessible,) whereupon all of the claimants, except Phipps & Co., appealed to the supreme court. Affirmed. The Prize Cases, 2 Black, (67 U. S.) 635.]

R. H. Dana, Jr., U. S. Atty., for the United States and the captors.

I. The property of an enemy, taken on the high seas, is prize of war; and residence in an enemy's country gives to the property of the resident, so found, a hostile character, irrespective of the actual feelings or intent of the owner. In such case, the condemnation is not a penalty on the owner for actual or implied hostility, but because the property is, or may become, a part of the resources of the enemy or be under the enemy's control. The Venus, 8 Cranch. [12 U. S.] 280; The Sally, Id. 384; The Frances, Id. 363; The Chester, 2 Dall. [2 U. S.] 41; Murray v. The Charming Betsy, 2 Cranch, [6 U. S.] 64; Maley v. Shattuck, 3 Cranch, [7 U. S.] 488; Livingston v. Maryland Ins. Co., 7 Cranch, [11 U. S.] 506; The Juffrouw Louisa Margaretha, 1 C. Rob. Adm. 203 note; The Lady Jane, Id. 202; The Hoop, Id. 198; The Bella Guidita, Id. 207; The Gerasimo, 11 Moore, P. C. 88; The Aina, 1 Spinks, 313, 28 Eng. Law & Eq. 600; The Abo, 1 Spinks, 347, 29 Eng. Law & Eq. 594; The Industrie, 1 Spinks, 444, 33 Eng. Law & Eq. 572; The Ida, 1 Spinks, 331; The Baltica, 11 Moore, P. C. 141; Brown v. U.

S., 8 Cranch, [12 U. S.] 110; The Danous. 4 C. Rob. Adm. 255, note; The President, 5 C. Rob. Adm. 277; Wheat. Int. Law, 429; 1 Kent, Comm. 56–60, 74–77.

II. In civil war, the government may exercise all the rights of the public war against rebels, among which are blockade, and the capture of property engaged in commerce upon the high sea. Wheat. Int. Law, 365; The General Parkhill, [Case No. 10,755a,] by Cadwallader, J.; The Tropic Wind, [Id. 14,187,] by Dunlop, J.; and The Hiawatha, [Id. 6,451;] The Hallie Jackson, [Id. 5,961;] The Crenshaw, [Id. 3,384;] The North Carolina, [Id. 10,317,] by Betts, J.; The Revere, [Id. 11,716;] Rose v. Himely, 4 Cranch, [8 U. S.] 272; Cheriot v. Foussat, 3 Bin. 252; Dobree v. Napier, 3 Scott, 225; U. S. v. Palmer, 3 Wheat. [16 U. S.] 635; The Santissima Trinidad, 7 Wheat. [20 U. S.] 306.

III. That Richmond, Va., was enemy's country at the time of the capture, is shown by the public acts of the president, by those of the state of Virginia, and of the confederate congress and executive, and by those facts of public notoriety of which prize courts always take cognizance. (Mr. Dana here cited various acts, proclamations, orders, ordinances, &c., of the president, of Virginia, and of the confederation.) A government de facto, engaged in war with the United States, was fully established there, with the apparent consent of the people of that district.

IV. The claimant being a resident in the enemy's territory, the onus is on him to show a reason why his property should not be condemned. The Primus, 1 Spinks, 353; The Magnus, 1 C. Rob. Adm. 31; 1 Wheat. [14 U. S.] 506, Append.; Otis v. Walter, 2 Wheat. [15 U. S.] 24; The Countess of Lauderdale, 4 C. Rob. Adm. 283; The Walsingham Packet, 2 C. Rob. Adm. 77.

V. The acts of congress of July 13, c. 3, (12 Stat. 255,) and August 6, c. 60, (12 Stat. 319,) do not relate to maritime captures under the war power. They are general acts, applicable to all future times, and not specially directed to the present state of things. They do not assume to determine what shall constitute a state of war, or whether or not there was, at the time of their passage, a war, or where and how far it extended, or what shall be considered a termination of a state of war. They rather recognize that those facts are to be passed upon by the president, from time to time, with full discretion as to policy in dealing with persons or districts. They confer certain powers on the president, attach certain consequences to his acts and declarations, and provide certain new and special modes of procedure. If the passing of those acts is to be construed as a legislative declaration that no captures or confiscations are to be made except under those acts, it will follow that the blockade, established by the proclamations of April last, could

not be enforced against neutrals, except where their property was used in aid of the insurrection, with the owner's knowledge, nor against our own vessels, except in that case, or in case of a trading with the enemy by vessels going directly to or from ports in loyal states. Vessels breaking blockade by voyages between enemy's ports, or bound to or from neutral ports, would not be reached by the act of July 13. The act of August 6, c. 60, would reach no property, contraband or not, which was not used in aid of the insurrection with the owner's knowledge; and section 6 of the act of July 13 reaches no vessels owned by rebels, and found in rebel ports; and a privateer could not be condemned without proof that the owners knew she was used in aid of the insurrection, and consented to the use. Yet the statute of August 6, c. 63, (12 Stat. 326,) confirms all the orders and proclamations of the president, including a blockade "under the law of nations," and was passed after many captures, as enemy's property, had been made, which the prior acts would not have warranted. The acts of 13th July and 6th August, c. 60, must be considered as avoiding all question of belligerent powers, and the time and mode of their use, and as providing additional civil and municipal forfeitures, to follow certain acts of the president. in any cases, now or hereafter. Any other construction would prevent the president from exercising any rights of capture, not provided for in those acts, whatever might be the state of a civil war, now or hereafter, and whatever the exigency. And the act of August 6, c. 63, must be treated as admitting the rightful exercise of the war power of blockade and capture in the present insurrection. Among all the condemnations of prizes that have been made, not one has been placed on the ground of the acts of July 13, or August 6, c. 60.

Sidney Bartlett & Edward Bangs, for claimants.

The fundamental question that must rule this case is:—Under our frame of government, when an armed rebellion exists, which, wrongfully availing itself of state or municipal organizations, and professing to act in their name, holds forcible possession of the territory of such state, or municipality, and when the government is attempting to suppress such rebellion by arms,—Do these facts, ipso facto, and without further legislation by congress, produce a state of war of such character that all persons, by retaining their residence within the limits of such state or municipality, become public enemies, and their property found at sea, or wherever found, and however innocently employed, becomes subject to confiscation by the United States? And it is submitted,—

I. That, regarded as a question of public

law, as held and applied to monarchical or other forms of governments with no written constitution like our own, there is no authority for the position that consequences of the character above set forth, ipso facto, in the absence of any decree, edict, or act of legislation, result from war against an armed insurrection occupying portions or districts of an empire or kingdom. Upon this point the doctrine, as stated by Mr. Justice Nelson, is as follows: "On the breaking out of a war between two nations, the citizens, or subjects, of the respective belligerents, are deemed by the law of nations to be the enemies of each other. The same is true, in a qualified sense, in the case of a civil war arising out of an insurrection or rebellion against the mother government. In the latter case, the citizens or subjects residing within the insurrectionary district, not implicated in the rebellion, but adhering to their allegiance, are not enemies, nor to be regarded as such. This distinction was constantly observed by the English government in the disturbances in Scotland under the Pretender and his son, in the years 1715 and 1745. It modifies the law, as it respects the condition of the citizens, or subjects, residing within the limits of the revolted district, who remain loyal to the government." (Charge to the grand jury, Nov., 1861.) Nor does the question of the magnitude of the rebellion affect the principle, since it can hardly be left to judicial tribunals to find whether that magnitude is sufficient to bring the principle into existence.

II. That, even if such results could be deemed to flow from the principles of public law, held and applied under other forms of governments, yet, under our constitution, the question is purely a political one, in which the judgment of the legal tribunal must follow and rest wholly upon the acts and declarations of the executive, based upon some act of congress, or upon the direct legislation of congress itself. Those acts, and that conduct, may create a state of war, attended by all the consequences of open public war with foreign enemies; or those consequences may be distinctly modified and changed in their application to war of this character, as may be determined by considerations of policy.

III. That the mere exercise, by the executive, of the powers confided to him by the constitution and laws to suppress insurrection,—such as calling out the militia, restraining access to and from ports or places held by rebels,—do, not, in the absence of special legislative provisions on the subject, create the general status of war, followed by the same consequences as war with foreign enemies.

IV. That the acts of congress, following and connected with, but not professing to repeal or modify, the acts and proclamations of the president, are to be construed together as declaratory of the original relations and liabilities of persons and property to the

government, flowing from the condition of public affairs to which they relate, and that these acts and proclamations show conclusively that no such state of public war exists, or has ever existed, as authorizes the confiscation of property found at sea, or elsewhere, merely because it belongs to citizens resident in a portion of the United States held by parties engaged in an armed insurrection. On the contrary, the acts of congress throughout show that no such result flows from this rebellion. Among other acts, that of July 13, 1861, declares that forfeiture shall attach to a ship or vessel found at sea or in port, from and after fifteen days from the issuing of the president's proclamation. Another (July 31, 1861, c. 28, 12 Stat. 283) provides for arming loyal citizens resident in the rebellious states,—citizens whose property, if found at sea, upon the theory of this libel, is to be the subject of forfeiture.

V. If the rule of public law could be held to warrant forfeiture without any legislation, yet the acts of congress in this case must be deemed to have repealed that rule.

SPRAGUE, District Judge. This vessel, with a cargo of coffee, of the value of one hundred and fifty thousand dollars, sailed from Rio Janeiro, on the 29th day of May last, bound for Hampton Roads; and, on the 10th day of July, was captured by the United States ship-of-war Quaker City, and sent into this district for adjudication. A libel has been filed against both vessel and cargo, as prize; and this hearing is upon the preparatory evidence, and the public acts of the United States and of the rebel states. Condemnation is asked on the ground of enemy's property. A claim to the greater part of the cargo has been presented in behalf of Messrs. Phipps & Co., British subjects resident in Rio Janeiro; but their title is disputed by the captors. Four hundred bags of the coffee have been claimed by Edmond, Davenport & Co., of Richmond, Va., and there is no doubt of their exclusive ownership. The question arising upon this claim of Edmond, Davenport & Co., will be first considered; because, if their part of the cargo be not liable to condemnation, the inquiry as to the ownership of the residue will be immaterial. This claim was filed on the 9th of August last by agents residing in New York. The claimants are therein described to be Robert Edmond, Isaac Davenport, Jr., and James Blair, merchants, copartners, residing and doing business in Richmond in the state of Virginia, under the firm name of Edmond, Davenport & Co. There is no evidence that they ever had any other residence or place of business. Is their part of the cargo liable to condemnation as enemy's property? That is the question.

In war, each belligerent may seize and confiscate all the property of the other, wherever found; and this right extends to the property, found at sea, of all persons permanently resident in the enemy's country. Property of private persons found by a nation within its own territory, on the breaking out of hostilities, is not usually confiscated by civilized nations, in modern times. The sovereign may, indeed, seize and appropriate it; but this being contrary to the general usage, it is not to be presumed that the sovereign wills it; and the courts, therefore, will not condemn such property without an express injunction to do so, which, in this country, must be by an act of congress. Brown v. U. S., 8 Cranch, [12 U. S.] 110. Very different are the public law and usages as to enemy's property found on the ocean, which is, by all nations, seized and condemned as lawful prize. In many countries, there are permanent prize tribunals, which, on the breaking out of a war, take cognizance of captures on the ocean, and this by virtue of their general jurisdiction, and without any special authority being imparted for the occasion. Such are the district courts of the United States. The mere creation by congress of a permanent prize court, would, it is believed, invest it with the jurisdiction and authority usually appertaining to such tribunals by the law and practice of nations. It is unnecessary, however, to dwell on this view, because there are several acts of congress relative to captures on the sea. These acts do not, in terms, confer upon the court the power to adjudicate cases of prize, but they assume and recognize the existence of that power, and regulate its exercise. Thus, the statute of 1800, c. 33, (2 Stat. 45,) makes it the duty of the commander of a vessel who shall capture or seize any vessel as a prize, to send all the papers found on board to the judge of the district to which the prize is sent. The same statute further provides that no person in the navy shall take from any vessel, seized as a prize, any property "before the same shall be adjudged lawful prize by a competent court," but "the whole shall be brought in, and judgment passed thereon." The same statute, and the acts of 1816, c. 56, (3 Stat. 287,) and of 1849, c. 103, (9 Stat. 374,) provide for the disposition of the proceeds of vessels and cargoes which shall be adjudged good prize. These statutes, to some extent, prescribe the mode of procedure, but do not define the jurisdiction of prize courts, nor prescribe the rules of decision. These are to be ascertained by reference to the known powers of such tribunals, and the principles by which they are governed, in determining what shall be deemed lawful prize under the public law, and the practice of nations.

What shall be deemed enemy's property is a question of frequent occurrence in prize courts, and on which certain rules and principles are well established. Property captured at sea and owned by persons resident in an enemy's country is deemed hostile and subject to condemnation, without any evidence as to the individual opinions or predi-

lections of the owner. If he be the subject of a neutral nation, or of the capturing belligerent, and has expressed no disloyal sentiments towards his native country, still his residence in the enemy's country impresses upon his property engaged in commerce and found upon the ocean a hostile character, and subjects it to condemnation. The Venus, 8 Cranch, [12 U. S.] 253. See, also, The Hoop, 1 C. Rob. Adm. 196, and the cases there collected; and also the cases cited by Cadwallader, J., in The General Parkhill, (Dist. Ct. E. D. Pa., July, 1861,) [Case No. 10,755a.] But it is contended that although this property might be liable to confiscation if the contest were a foreign war, yet that it is otherwise in a rebellion or civil war. This requires attention. As the constitution gives congress the power to declare war, some have thought that without such previous declaration, war, in all its fulness, that is, carrying with it all the incidents and consequences of a war, cannot exist. This is a manifest error. It ignores the fact that there are two parties to a war, and that it may be commenced by either. If a foreign nation should send its fleets and armies to capture our vessels, ravage our coast, and invade our soil, would not this be war,—giving to the United States, as a nation, the position and rights of a belligerent? Such hostilities would impose upon the president the duty of exerting all his powers, as commander-in-chief of the army and navy, to capture or destroy the enemy; and if, under his instructions, an enemy's ship should be taken and sent in for adjudication, the prize court must proceed to decide the question of prize upon the principles of public law. How this civil war commenced, every one knows. A traitorous confederation, comprising several organized states, after seizing by force several forts and custom-houses, attacked a fortress of the United States garrisoned with its soldiers, under the sanctity of its flag, and by superior military force compelled those soldiers to surrender, and that flag to be lowered. This was war,—open, flagrant, flagitious war; and it has never ceased to be waged by the same confederates with their utmost ability. Some have thought that because the rebels are traitors, their hostilities cannot be deemed war, in the legal or constitutional sense of that term. But without such war there can be no traitors. Such is the clear language of the constitution. It declares that treason against the United States "shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." Some have apprehended that if this conflict of arms is to be deemed war, our enemies must have, against the government, all the immunities of international belligerents. But this is to overlook the double character which these enemies sustain. They are at the same time belligerents and traitors, and subject to the liabilities of both; while the United States sustains the double character of a belligerent and sovereign, and has the rights of both. These rights co-exist, and may be exercised at pleasure. Thus, we may treat the crew of a rebel privateer merely as prisoners of war, or as pirates, or traitors; or we may, at the same time, give to a part of the crew the one character, and to the residue the other. And, after treating them as prisoners of war, we may exercise our sovereign power and deal with them as traitors. The temporary non-user of such rights is not a renunciation of them, but they may be called into practical exercise at pleasure. In modern times, if a rebellion has assumed such dimensions as to raise armies and involve great numbers, it has not been usual, during the contest, to exercise toward prisoners the sovereign right of dealing with them as traitors. They have generally been treated as prisoners of war until the contest is over. But this forbearance does not preclude their government from afterwards inflicting such punishment as justice and policy may require.

Mr. Wheaton, in his "Elements of International Law," page 365, so strongly maintains belligerent rights in civil war, that some of his language would imply that there are no other rights. This, however, could not have been intended; for, if sovereign rights be at an end, the war is merely international. Civil war, ex vi termini, imports that sovereign rights are not relinquished, but insisted on. The war is waged to maintain them. Rose v. Himely, 4 Cranch, [8 U. S.] 272, was a case arising out of the exercise of sovereign rights by France in her civil war with St. Domingo. The courts recognized the co-existence of belligerent and sovereign rights. Cheriot v. Foussat, 3 Bin. 252, also arose out of a municipal regulation made by France in the same civil war; and the court remark that France was possessed of belligerent rights which might be exercised against neutral nations. Dobree v. Napier, 3 Scott, 225, arose out of a blockade of the coast of Portugal by the queen of that country; and the condemnation of a vessel as prize for the breach of it was holden to be valid. See, also, The Santissima Trinidad, 7 Wheat. [20 U. S.] 306, and U. S. v. Palmer, 3 Wheat. [16 U. S.] 635. The United States has, during the present war, exercised both belligerent and sovereign rights. Examples of the former are, receiving capitulations of the enemy as prisoners of war, and holding and exchanging them as such; and a still more prominent instance is the blockade, which, before the assembling of congress, was established by the military authority of the commander-in-chief.

I am satisfied that the United States, as a nation, has full and complete belligerent rights, which are in no degree impaired by the fact that its enemies owe allegiance, and have superadded the guilt of treason to that of unjust war. But it is insisted that if these

rights exist, still the authority to exercise them by arresting and condemning enemy's property must emanate from the legislature; and that there has been no legislation authorizing this capture.

Congress has established permanent prize tribunals, and created an army and navy. The constitution declares that the president shall be the commander-in-chief of the army and navy of the United States. He is thus clothed with all the power appertaining to that high office; and he is not only authorized, but bound, to exert it when the exigency for which it was given shall arise. If a hostile power, either from without or within our territory, shall assail and capture our forts, and raise armies to overthrow our government, and invade its soil, and menace the capital of the nation, and shall issue commissions to public and private armed ships to depredate on our commerce, the president is bound to use the army and navy to carry on the war effectively against such an enemy, both by land and by sea. And he may do so in the manner, and by the measures, usual in modern civilized warfare; one of the most familiar of which is the capture of enemy's property, public and private, on the ocean. In war, the commander-in-chief is not only authorized to make captures by sea and conquests by land; but he may even govern the conquered territory, until congress shall have seen fit to interpose by legislation. In our last war, California having been subjugated, the commander-in-chief imposed duties, established custom-houses, and collected revenues; and this was sanctioned by the supreme court as a legitimate exercise of military power. Cross v. Harrison, 16 How. [57 U. S.] 164. There can be no doubt of the right of the president to make maritime captures and submit them to judicial investigation. It is one of the best-established and least dangerous of his powers as commander-in-chief. Further than this, congress has legislated upon the subject, although it was not necessary for it to do so. The statute of 1807, c. 39 (2 Stat. 443,) provides that, whenever it is lawful for the president to call forth the militia to suppress an insurrection, he may employ the land and naval forces of the United States for that purpose. The authority to use the army and navy is thus expressly confirmed; but the manner in which they are to be used, is not prescribed. That is left to the discretion of the president, guided by the usages and principles of civilized war; and these principles and usages undoubtedly authorize the capture of enemy's property at sea.

What is enemy's property is a judicial question, to be decided by the prize courts; and, unless otherwise instructed by their own sovereign, they must be guided by the rules and principles of public law. Property may be condemned as hostile, without proof of the personal sentiments of the owner being disloyal. Acts which tend to subserve the interests of the enemy may impress a hostile character upon property, without regard to the political views or wishes of the owner. Residence of the owner in the enemy's country may be of such a character as to stamp the property conclusively as hostile. How far residence may, in any case, be open to explanation, or the presumption arising therefrom be repelled, I have no occasion to consider. When a hostile character is imputed to property because of the residence of the owner, the court may be compelled to decide whether the place of his residence be enemy's country. What shall be deemed enemy's country is sometimes a question of much difficulty. Some nations or tribes can hardly be said to have any country. Such are the nomadic Arabs, and such were the children of Israel during some part, at least, of their migration from Egypt. A belligerent nation may invade a neutral province, and hold the control of it, and yet the possession be such as not necessarily to impress upon the inhabitants a hostile character. Thus in the case of The Gerasimo, 11 Moore, P. C. 101, it was decided that, although Russia had taken forcible possession of the Danubian principalities, and for a time held dominion over them, yet that a ship of a resident of Wallachia was not liable to capture by a British cruiser as enemy's property; the occupation of that province by Russia being not only forcible, against the will of the inhabitants, but avowedly temporary, and for a special purpose. If Wallachia, by its local government, the Hospodar and Divan, had voluntarily joined with Russia and made common cause in the war against England, the inhabitants would, unquestionably, have been enemies, and their property on the ocean lawful prize.

In cases which may come within the definition of civil war, there may be only an assemblage of individuals in military array, without political organization or territorial limit; or armed bands may make hostile incursions into a loyal state, or hold divided, contested, or precarious possession of portions of it, as now in Missouri and Kentucky. In such cases, local residence may not create any presumption of hostility. Far otherwise is it in Virginia. On the seventeenth day of April, 1861, being immediately after the rebel confederates had attacked and captured Fort Sumter, a convention of delegates, by solemn ordinance, undertook to place all the inhabitants of that state in an attitude of rebellion, and to join in the war which had been previously begun against the United States. The act of rebellion was to take immediate effect, and an alliance making common cause with the confederate enemy was immediately formed, and hostilities actively waged by armies raised within, and invited from without, the state. All this was, indeed, subject to be disaffirmed by a vote of the whole people of the state, to be

taken on the twenty-third day of May; but no part of it has been disaffirmed. On the contrary, the popular vote on that day, apparently by a large majority, ratified the proceedings of the convention, the alliance, and the war. The western counties of the state nobly vindicated their honor and their fidelity, by refusing submission to rebel mandates, and adhering to the Union. They did not, indeed, change their domicil, but they removed the power of rebel Virginia from the place of their domicil. The Virginia rebellion was not the act of individuals asserting that moral right of revolution which belongs to all subjects, but it was the assertion of a pretended state right. It was founded solely on the deadly doctrine of secession, which claims that the state, as an organized political body, may sever itself from the Union. In attempting this, and carrying on the war, it acted by majorities claiming implicit obedience from the minority. The exterior boundaries of the state and its internal division by counties have been clearly defined; and the city of Richmond, where these claimants reside, is within the territory over which, by known limits, this political body has, for nine months past, held absolute dominion. Such residence subjects both property and person to the absolute control of the enemy, and augments his resources and his strength. And I see no sufficient reason why it is not to be deemed a continued residence in an enemy's country, which subjects property captured on the ocean to condemnation as lawful prize. In this case, it does not appear that the claimants ever had a domicil in any other place than Richmond; nor is there any evidence going to explain their continuance there, or to repel the presumption of hostility arising therefrom. It is not necessary, therefore, to decide whether such evidence could be admitted, or what would be its effect. In questions so novel, I do not think fit to go farther than the case before me requires. But it is objected that the question, what persons or country are to be deemed hostile, is not a judicial one; or rather that the courts cannot consider any person or country to be hostile, unless the legislature has previously designated them as such. This is directly met by the case of The Gerasimo, 11 Moore, P. C. 101, above cited, in which the sole question was whether the province of Wallachia was enemy's country, so as to subject the property of a resident therein to capture as prize. This question the high court of admiralty decided in the affirmative, and the privy council in the negative. Both decisions were founded exclusively upon the character of the Russian occupation, as exhibited by the evidence, the court having no aid or instruction by any act either of the queen or the parliament. The cause was most elaborately discussed, both by the bar and the bench, and yet not a doubt was suggested of the question being strictly judicial.

This objection, that it does not belong to the court to decide who shall be deemed enemies, or rather, that the court can decide only one way, and that against the captors, unless congress has previously declared who shall be considered enemies, really carries us back to the questions whether there can be war without a declaration by congress, and whether, in civil war, the parent country has full belligerent rights. Those questions have already been considered; and it is believed that such rights exist, and among them, undoubtedly, is that of making maritime captures of enemy's property. And when property is brought in for adjudication, the court must decide whether it be hostile or not; and, in doing so, it must, in the absence of legislative instruction, be guided by general principles and usage, under which one criterion of enemy's property is the residence of the owner. This is a known and well-established rule of decision which the court cannot disregard. It is not necessary, however, to determine how the court would deal with these questions in the absence of any action by other departments of the government, because there has been such action. In addition to other important acts, the president, by proclamation of the twenty-seventh of April, [12 Stat. 1259,] established a blockade of the ports of Virginia. This was the exercise of a great belligerent right, and could have been done under no other. He could not prohibit or restrict the commerce of any state by a mere municipal regulation. The blockade was avowedly established as a belligerent act under the law of nations; and it was accordingly announced that it would be rendered effective by an adequate naval force; and, in all proceedings in relation to it by our own country and other nations, it has been regarded as a belligerent act. Under it there have been divers captures by our navy and condemnations by our courts. Now such a blockade could not be valid unless it be of enemy's country.

Some have thought that it was to be deemed enemy's country, because of the proclamation of the president. It seems to me rather that the proclamation and the blockade are to be upheld as legal and valid because the territory is that of an enemy. But whichever view is adopted, the result is the same; namely, that the court must regard the country as hostile. Richmond, where these claimants reside, is one of the places that was thus blockaded. This is not all. The proclamation of a blockade of Virginia, as hostile territory, and the orders of the president to the navy, under which captures like the present have been made, have been expressly confirmed by congress. The statute of 6th August last, c. 63, declares that such acts and orders shall have the same efficacy as if they had been previously authorized by legislative enactments. Without going into a discussion of the effect of that confirmation, it is evident that it must have

the force of an instruction to prize tribunals to regard those proceedings of the president as legal and valid.

It has been urged that in a civil war it may sometimes be very impolitic to confiscate the property of persons resident in the rebel country; and that the expediency of doing so is a political question to be determined by the legislature. We are now dealing only with maritime captures. It is true that policy may sometimes require that the property of such residents should be exempted from arrest; and it is quite as certain that sometimes it ought not to be exempted. There should therefore be somewhere lodged a discretionary power to capture this property or not, as varying circumstances and exigencies may require. This power is now vested in the president. He controls the navy, and directs what captures shall be made. He may instruct inferior officers that particular vessels, or those belonging to certain persons, or engaged in a particular trade, are not to be arrested.

What captures shall be made, like many other questions of policy in conducting the war, may beneficially be left to the discretion of the commander-in-chief. The statute of 1861, c. 28, (12 Stat. 283,) has been referred to as assuming that there are loyal citizens in the rebel states who are to be aided and protected, and it is urged that their property should not be subject to confiscation. That act places two millions of dollars in the hands of the president, to be used at his discretion in arming, organizing, and sustaining loyal citizens in rebel districts. This act undoubtedly contemplates that there may be such loyal citizens, and that it may be expedient so to aid and strengthen them: and it makes an appropriation for that purpose. But it is wisely left to the unrestricted judgment of the president to determine who are such loyal citizens, if any, and to what extent they shall be treated as such. It adds to the means of the president, but in no degree detracts from his previous authority, to treat persons or property as he shall deem best. It has been contended that the proviso in the 24th section of the crimes act of 1790, c. 9, (1 Stat. 117,) should prevent condemnation of this cargo as prize. That act describes certain offenses and prescribes their punishment; and among them is the crime of treason. The proviso declares that no conviction shall work corruption of blood or any forfeiture of estate. This shows that the law-givers thought that death was a sufficient penalty, without confiscation following as a legal consequence of conviction. There is an analogous provision in the constitution, art. 3, § 3; and, as it has embarrassed some minds, it deserves attention. In the first place, the objection assumes that there can be no condemnation unless the claimants are traitors. This is an error. As already stated, property may be treated as hostile, although the owner has not been guilty of treason. He may be an alien, owing no allegiance; or a citizen, whose opinions or wishes are not proved to be hostile, and yet he may be so situated, and his property be so used, as to subject it to capture as prize. A striking case is to be found in The Venus, 8 Cranch, [12 U. S.] 253. In that case, a citizen of the United States, residing at Liverpool, shipped property for New York on the 4th of July, 1812, having no knowledge of the war, which had been previously declared by the United States. This property was captured by an American privateer, and held by the supreme court to be lawful prize. The court, in delivering their opinion, say that although the claimant, being a citizen of the United States, "cannot be considered an enemy in the strict sense of the word, yet he is deemed such, with reference to the seizure of so much of his property concerned in the trade of the enemy as is connected with his residence. It is found adhering to the enemy. He is himself adhering to the enemy, although not criminally so." See also the cases collected by Sir William Scott, in The Hoop, 1 C. Rob. Adm. 196.

In the case now before me, it is not proved or contended by either party that these claimants have been guilty of the crime of treason; and surely the claimants cannot set it up, in argument, as a defence. In the second place, the owner may, by certain acts, have subjected his property to be treated as enemy's, and, by other distinct acts, committed the crime of treason; and confiscation may be inflicted for the former, and the penalty of death for the latter,— just as the same person may be guilty of larceny, and subsequently of murder, and be fined for the first, and afterwards convicted of the capital offence. Third, suppose there should be but one act, which is such a use of property as subjects it to confiscation, and, at the same time, constitutes an overt act of treason; and suppose, further, that the government cannot proceed for both penalties, yet they may elect. They are not bound to prosecute for the crime; and if they enforce the forfeiture, the most that can be contended is, that they are thereby precluded from subsequently having a conviction for the treason.

The acts passed by congress last summer have been referred to as expressing the views of the legislature upon the subject of confiscations in the present war. As they do not reach cases like the present, it is contended that it was the intention of the legislature that such property should not be condemned. It is obvious that, in their general purpose and effect, they were intended to make the prosecution of the war more efficient, to give additional means and power to the president, but in no degree to curtail the authority which he previously possessed. They embrace some cases in which confiscation would not follow from the general

law, and render others more definite and certain, and provide new modes of procedure. The belligerent right of capture at sea previously existed, and congress has left it unimpaired. Further still: This right of maritime capture was not only well known, but had actually and notoriously been exercised. The last session of congress closed on the 6th day of August. Prior to that time, divers captures had been made of vessels and cargoes belonging to inhabitants of insurgent districts. In particular, the General Parkhill was captured on the twelfth day of May, and sent to Philadelphia, and there condemned as enemy's property at the June term of the district court, [Case No. 10,755a.] The Pioneer, [Id. 11,172,] The Crenshaw, [Id. 3,384,] The North Carolina, [Id. 10,317,] and The Hallie Jackson, [Id. 5,961,] were sent into the port of New York in the course of May and June, and the vessels or their cargoes have since been condemned as enemy's property. In this very case of The Amy Warwick, the capture was made on the 10th of July, and the libel was filed on the 18th of that month. All these captures were made by ships of war, and, of course, under orders emanating from the president. Yet, so far from discountenancing these proceedings, congress, as we have already seen, did, by the act of the 6th of August, c. 63, § 3, expressly confirm all orders respecting the army and navy which had been made by the president since the 4th of March last. The counsel for the claimant has relied upon a recent charge by Mr. Justice Nelson to the grand jury, in the second circuit. That learned judge did not enter into any discussion of prize law. The occasion did not call for it. He expressed the opinion, if correctly reported in the newspapers, that loyal citizens of rebel districts were not to be treated as enemies, nor their property confiscated. But he did not undertake to say who were to be deemed loyal citizens, what was to be the evidence of their fidelity, or how the presumptions arising from continued residence in the enemy's country were to be overcome. The counsel for the captors has relied upon a remark made by Judge Dunlop in the case of The Tropic Wind, [Case No. 14,187,] and upon the learned decisions of Judge Cadwallader in the case of The General Parkhill, [supra,] and of Judge Betts in the cases of The Crenshaw, The North Carolina, The Pioneer, and The Hallie Jackson, [supra.] These cases are directly in point; and I might well have rested my decision solely upon the authority of those

able and distinguished judges. But as it has been contended that those decisions are not sustained by the authorities which were cited in their support, I have yielded to the earnest invitation of the eminent counsel in this cause, to investigate the principles and authorities which it involves. Claim rejected, and the property condemned.

[NOTE. On appeal to the circuit court the district court decrees were affirmed, whereupon Edmond, Davenport & Co., Dunlop, Moncure & Co., and David Currie and others appealed to the supreme court. The decree appealed from was duly affirmed. Mr. Justice Grier, in delivering the opinion of the court, said: "The war is not the less a civil war, with belligerent parties in hostile array, because it may be called an 'insurrection' by one side, and the insurgents considered as rebels and traitors. It is not necessary that the independence of the revolted province or state be acknowledged in order to constitute it a party belligerent in a war, according to the law of nations. Foreign nations acknowledge it as a war by their declarations of neutrality. The condition of neutrality cannot exist unless there be two belligerent parties. * * * Whether the president, in fulfilling his duties, as commander-in-chief, in suppressing an insurrection, has met with such armed resistance, and a civil war of such alarming proportions as will compel him to accord to them the character of belligerents, is a question to be decided by him, and this court must be governed by the decisions and acts of the political department of the government to which this power was intrusted. He must determine what degree of force the crisis demands. The proclamation of blockade is, itself, official and conclusive evidence to the court that a state of war existed which demanded and authorized a recourse to such a measure, under the circumstances peculiar to the case. * * * Therefore, we are of opinion that the president had a right, jure belli, to institute a blockade of ports in possession of the states in rebellion which neutrals are bound to regard." The court held further that "enemies," in the technical sense in which it is used in prize courts, distinct from the common law, include rebels and traitors as well as aliens; that the seceding states claimed to be sovereign, and to absolve their citizens from allegiance; that the territory within the southern lines was all enemies' territory, because claimed and held in possession by an organized, hostile, and belligerent power. "All persons residing within this territory, whose property may be used to increase the revenues of the hostile power are, in this contest, liable to be treated as enemies, though not foreigners." The liability to capture as enemies' property does not in any manner depend on the personal allegiance of the owner. It is the illegal traffic that stamps it as enemies' property. It is of no consequence whether it belongs to an ally or a citizen. "The produce of the soil of the hostile territory, as well as other property engaged in the commerce of the hostile power, as the source of its wealth and strength, are always regarded as legitimate prize, without regard to the domicile of the owner, and much more so if he reside and trade within their territory." The Prize Cases, 2 Black, (67 U. S.) 635. See Alexander's Cotton, 2 Wall. (69 U. S.) 404, 419.]