**UNITED STATES of America**

**v.**

**Richard C. REID, Defendant.**

**No. CRIM.A. 02–10013–WGY.**

United States District Court,
D. Massachusetts.

July 26, 2002.

Stephen G. Huggard, Washington, DC, for U.S.

Owen S. Walker, Office of the Federal Defender, Tamar R. Birckhead, Federal Defender Office, Boston, MA, for Richard C. Reid.

**MEMORANDUM AND ORDER CONCERNING PARTICULAR SAMs AND REVISING EARLIER COURT ORDERS**

YOUNG, Chief Judge.

Responding swiftly to the most devastating terrorist attack on America in our nation's history—one that originated within our own borders—the President vigorously exercised his war powers. Within days, special forces were on the ground half a world away finding the foes thought to have conceived the attack and trained its perpetrators. Thereafter, in connection with our allies, the President promptly committed air, sea, and land forces in combat with the suspected terrorist masterminds and their allies to root out and destroy them. Closer to home, the President called out the National Guard. Once again, as has happened so often in our history, committed citizens left their daily tasks to secure the nation's airports, inspect its vehicles, fly air cargo missions, patrol its harbors, and safeguard its water supplies. Restrained only by Congress and the Constitution, the President as commander in chief has the legal right—indeed, he has the sworn duty—so to provide for the common defense. *E.g., The Prize Cases,* 67 U.S. (2 Black) 635, 668–71, 17 L.Ed. 459 (1862) (upholding President Lincoln's exercise of war powers—a naval blockade—in the absence of a congressional declaration of war, or any affirmative congressional action at all, Congress then being in recess).[1]

Further, on November 13, 2001, the President promulgated an executive order authorizing military tribunals to try noncitizens whom he determined met certain criteria. Detention, Treatment, and Trial

---

1. This expansive view of the President's war powers was first articulated by my predecessor, Hon. Peleg Sprague, in the *Amy Warwick,* 1 F. Cas. 799, 802, 804 (D.Mass.1862) (No. 341). *See generally* William G. Young, *Amy Warwick Encounters the Quaker City: The District of Massachusetts and the President's War Powers,* 74 Mass. L.Rev. 206 (1989).

of Certain Non–Citizens in the War Against Terrorism, 66 Fed.Reg. 57,833 (Nov. 13, 2001) [hereinafter Executive Order]. Of note here, such military tribunals are not limited to the theaters of active combat operations, but are authorized to sit within the United States itself, *see id.* §§ 3(a), 4(c)(1), where the federal district courts have exclusive jurisdiction over the trial of federal crimes. *Compare Ex Parte Quirin,* 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942) (holding that an unlawful enemy belligerent may be tried by secret military tribunal within the territorial jurisdiction of United States District Court), *with Ex Parte Milligan,* 71 U.S. 2, 4 Wall. 2, 18 L.Ed. 281 (1866) (holding that, absent proper declaration of martial law, a secessionist saboteur who is not himself an enemy belligerent may not be tried by military tribunal within the territorial jurisdiction of United States District Court).[2]

Before this attack, the President's chief law enforcement officer, the Attorney General, promulgated emergency regulations which allow the imposition of "Special Administrative Measures" ("SAMs") upon any federal prisoner as to whom he finds that "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons . . . ." 28 C.F.R. § 501.3(a) ("Prevention of acts of violence and terrorism.")[3] (1996). The Attorney General has issued such SAMs against Richard C. Reid ("Reid"), the defendant in this case, under the authority of section 501.3.

SAMs issued pursuant to section 501.3 are implemented "upon written notification to the Director, Bureau of Prisons, by the Attorney General or, at the Attorney General's direction, by the head of a federal law enforcement agency, or the head of a member agency of the United States intelligence community." *Id.* § 501.3(a). SAMs may be imposed for up to a one-year period upon the approval of the Attorney General, and may be renewed. *Id.* § 501.3(c). The power of the Attorney General to impose SAMs derives mainly from 5 U.S.C. § 301, which grants the heads of executive departments the power to create regulations designed to assist them in fulfilling their official functions and those of their departments, and 18 U.S.C. § 4001, which vests control of federal prisons in the Attorney General and allows him to promulgate rules governing those prisons.[4]

2. One of America's leading legal scholars in the study of civil liberties in wartime is the Chief Justice of the United States. *See* William Rehnquist, *Civil Liberty and the Civil War: The Indianapolis Treason Trials,* 72 Ind. L.J. 927 (1997).

3. The Attorney General can also direct the imposition of SAMs that are reasonably necessary to "prevent disclosure of classified information" upon receiving written certification from the head of a member agency of the United States intelligence community that "the unauthorized disclosure of such information would pose a threat to the national security and that there is a danger that the inmate will disclose such information." 28 C.F.R. § 501.2(a) ("National Security Cases.") This regulation is not at issue in this case.

4. According to the government, the particular SAMs in this case have been issued upon request by the Attorney General to the Director of the United States Marshals Service (the "Marshals Service"). When asked by the defense under what authority the particular SAMs were issued, and for written notice of their issuance, the government replied that the defense should consult 28 C.F.R. §§ 501.3 and 500.1, Magistrate Judge Dein's Order Section IV.(1), and 28 U.S.C. § 561, which establishes the Marshals Service, headed by a Director appointed by the President with the advice and consent of the Senate, places it under the control of the Attorney General, and gives the Attorney General the power to delegate authority to the Director. *See* Def.'s Reply at 10–11 [Docket No. 58] (discussing this dispute). It thus appears that this organ-

SAMs are prisoner-specific; that is, each prisoner upon whom SAMs are imposed has a set of SAMs issued for him, and him alone, based on the circumstances of his case. This Memorandum discusses, to the extent necessary, the SAMs issued with respect to Reid, a foreign national detained under order of this Court and awaiting trial on serious charges, and explains this Court's orders in light of the SAMs.

## I. BACKGROUND

Reid is alleged to have attempted to blow American Airlines Flight 63 ("Flight 63") out of the sky with bombs concealed in his shoes on December 22, 2001, while over the Atlantic Ocean en route from Paris to Miami.[5] The plane was immediately diverted to Boston, where it landed in the early afternoon. Reid was turned over to the F.B.I. at that time.

An American grand jury sitting in the District of Massachusetts promptly indicted Reid on a variety of federal charges. Reid was arraigned and ordered detained after a hearing before Magistrate Judge Judith Dein. Prior to the hearing, Magistrate Judge Dein appointed the Federal Defender Office in the District as Reid's counsel, having found that Reid was unable to retain counsel. The Chief Public Defender, Owen S. Walker, Esq., has undertaken Reid's defense, assisted by Defenders Tamar R. Birckhead, Esq., and Elizabeth L. Prevett, Esq.

On March 4, 2002, this Court held an initial scheduling conference pursuant to Local Rule 116.5(A). The Court scheduled a variety of pre-trial matters, including a motion to suppress, and tentatively scheduled trial to commence November 4, 2002. Throughout, the conduct of all counsel for the government and the defense has been, and continues to be, marked by the utmost professionalism and civility.

On that day, however, unbeknownst to the Court, the SAMs began to play a significant role in this case. Two weeks earlier, on February 19, 2002, the Marshals Service unilaterally, without seeking the Court's prior permission, imposed case-specific SAMs on the detention of Reid. The portion of these SAMs concerning Reid's attorney-client communications reads:

> d. Defense Counsel May Disseminate Inmate Conversations—The inmate's attorney may disseminate the contents of the inmate's communications to third parties for the sole purpose of preparing the inmate's defense—and not for any other reason—on the understanding that any such dissemination shall be made solely by the inmate's counsel, and not by the counsel's staff.

Gov't's Protective Order Mem., Attach. A, at 2 [Docket No. 97]. "Attorney" is defined as the inmate's attorney or attorneys of record, verified and documented by the government. *Id.* at 1 n. 1. "Staff" is meant to refer to "Pre-cleared" staff members of Reid's defense team: co-counsel, paralegals, investigators, or translators actively engaged in his defense, who have submitted to a background check by the F.B.I. and the United States Attorney for the District of Massachusetts and have been successfully cleared, and who have agreed to adhere to the SAMs by signing the

---

ic statute allows the Attorney General to authorize the Director to impose SAMs under 28 C.F.R. § 501.3.

**5.** The allegations are detailed at length in this Court's first opinion in the case, *United States*

*v. Reid,* 206 F.Supp.2d 132, 133 (D. Mass. 2002) [Docket No. 72], *available at* http://pacer. mad.uscourts.gov/dc/opinions/young/pdf/richardreid.pdf.

affirmation required of all those engaged in Reid's defense. *Id.* at 2 n. 2. (The issue of signing an affirmation is taken up below at Part III.B.) Co-counsel, i.e., other lawyers engaged in Reid's defense, and the attorneys' paralegal staff, may meet with Reid face to face without Reid's attorneys being present, but the government seeks completely to prohibit the nonlawyer staff of the public defenders office, translators, potential fact witnesses and prospective defense experts, such as a psychiatrist, from meeting with Reid without his attorneys. *Id.* at 2–3. Such persons are permitted to talk with the defendant on the telephone as long as Reid's attorneys participate in the call, *id.* at 3, and presumably these properly designated individuals may meet with Reid if accompanied by his attorneys of record. Paragraph 2(j) of the SAMs allows Reid to provide written documents and drawings to his attorney for the purposes of preparing his defense, but require counsel to retain these documents and not disseminate them to anyone not engaged in Reid's defense; paragraphs 2(i) and (k) require that the attorneys show Reid only documents related to his defense and that they not, under any circumstances, divulge, forward, or send the contents of his mail to any third parties. *Id.* at 5–6. Paragraph 2(h) outlines Reid's privileged telephone conversations for the purpose of conducting his own defense, and requires that these conversations not be overheard by any third parties not engaged in his defense. *Id.* at 3–5. Finally, Paragraph 2(a) requires Reid's attorneys, their paralegal staff, designated co-counsel, and investigators to acknowledge and sign off on the SAMs. This paragraph reads as follows:

a. Attorney Affirmation of Receipt of the SAM Restrictions Document—The inmate's attorney (or counsel)—individually by each if more than one—must sign an affirmation acknowledging receipt of the SAM restrictions document. The Federal Government expects that the attorney, the attorney's staff, and anyone else at the behest of, or acting on behalf of, the attorney, will fully abide by the SAM outlined in this document; that expectation is set forth in the SAM restrictions document.

i. The [United States Attorney for the District of Massachusetts] shall present, or forward, the "attorney affirmation of receipt of the SAM restrictions document" to the inmate's attorney.

ii. After initiation of SAM and prior to the inmate's attorney being permitted to have attorney/client-privileged contact with the inmate, the inmate's attorney shall execute a document affirming the receipt of the SAM restrictions document and return the original to the [United States Attorney].

iii. The [United States Attorney] shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, DC.

*Id.* at 1.

On March 4, 2002, Reid's attorneys informed the government that they had no intention of signing any such affirmation. Approximately six days later, the government entirely cut off defense counsels' communication with their client.

On March 25, 2002, defense counsel filed an emergency motion to enjoin the Attorney General and the United States Attorney from barring their communication with Reid. Reid's attorneys sought an immediate hearing. Commendably, Docket Clerk Marie Bell hand carried this motion to the courtroom where I was in the midst of impaneling a jury in a civil rights action,

*Lopes v. Mattapoisett,* Civil Action No. 00–11970–WGY.

Scanning the motion, I learned for the first time of this conflict. Reasoning that unfettered confidential communication between client and attorney lies at the very heart of the Sixth Amendment constitutional guarantee of the right to counsel in a criminal case, I scheduled a prompt hearing that same afternoon—and botched it.

At the hearing, defense counsel attacked the propriety of the SAMs but I evaded the issue, reasoning first that the SAMs did not apply to Reid, as he was a pre-trial detainee presumed to be innocent, and second that, as he has been detained by order of Magistrate Judge Dein, he was somehow in the custody of the judicial and not the executive branch of government. Therefore, I found it unnecessary to reach the constitutional issues concerning the applicability of the SAMs and set about framing an order concerning the conditions of Reid's confinement and communications with counsel. I wound up saying "If the executive seeks to subject him to the strictures of a prisoner, they know what to do. They must prove that he is guilty of one or more of the crimes with which he is charged before an American jury unanimously beyond a reasonable doubt." Emergency Hr'g Tr. at 25. While this has a surface plausibility and a rather nice ring, the entire analysis is simply wrong.

Before detailing the flaws in the Court's approach, however, the Court recounts what it did. On March 25, 2002, the Court issued the following order (the "Emergency Order"):

Subject to reconsideration upon further briefing:

1. The United States Marshal is to maintain the defendant so he may be brought before the Court. He is to be maintained so that his safety is to be taken into consideration as well as the safety of the people of the United States. The defendant is not to be moved within the district or without the district without the prior permission of this Court.

2. Tamar Birckhead and Owen Walker shall have access to the defendant at all reasonable times and dates consistent with the security of the institution and the pre-existing regulations of the institution.

3. There will be no monitoring of the defendant while in the presence of the attorneys.

4. The substance of what the defendant has to say is confidential to his attorneys and must be held inviolate and not communicated to anyone.

5. This order is stayed from 3:35 p.m. March 25, 2002, to 10 a.m. March 26, 2002, to allow either party to seek further review.

Docket No. 34.

No one appealed the Emergency Order and it took effect in accordance with its terms. Defense counsel thus secured its goal of obtaining relatively unfettered access to their client. The Court, however, went further and ordered a number of other things as well. One of them was unnecessary and the remainder have proved unwise.

Paragraph 3 —prohibiting government monitoring of face-to-face attorney-client communications—is unnecessary because the government has never sought to infringe on the attorney-client privilege in this way with these particular SAMs.

Moreover, the analysis undergirding the Emergency Order began to collapse even before I got back to chambers following the emergency hearing. By then, I realized that the regulations of the Attorney General authorizing the issuance of SAMs

explicitly comprehended their applicability to pre-trial detainees. 28 C.F.R. § 500.1(c).

Worse was to follow.

As the Supreme Court made clear in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), Reid is not now, nor was he ever, in the custody of the judicial branch of government. Rather, the jurisdiction of this Court in this regard is limited to (a) determining whether Reid's seizure was supported by probable cause to believe he committed a crime, *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); (b) deciding whether he poses a danger to the community and presents a serious risk of flight, thus warranting detention until trial, 18 U.S.C. §§ 3142(e), (f)(1)(A), (f)(2)(A); (c) entertaining the detainee's claims that the conditions of his confinement violate express constitutional guarantees, *see Bell*, 441 U.S. at 534–35, 536–37, 99 S.Ct. 1861; and (d) adjudging whether any of his conditions of confinement amount to "punishment" in violation of the Due Process Clause, *id.* at 535, 99 S.Ct. 1861. Magistrate Judge Dein inquired into the first two of these four questions at a hearing on December 28, 2001, and after answering them both in the affirmative, properly remanded him to the custody of the executive branch, more specifically to the custody of the Attorney General. Mem. & Order at 1–2, 7, *Reid* (D.Mass. Dec. 28, 2001) (Dein, M.J.) [Docket No. 3], *available at* http:// pacer.mad.uscourts.gov/dc/opinions /dein/pdf/reid-detention-pc.pdf. As a consequence, the pre-existing regulations of the Marshals Service and the state institution where Reid is being housed, as well as the SAMs pertaining to Reid, are all presumptively valid. Regrettably, I made none of this clear at the emergency hearing. To the extent I there said anything to the contrary, it is void and of no effect.

Time passed. The Court understood the parties were attempting to negotiate by agreement modifications to the Emergency Order. At a hearing on April 22, 2002 concerning the steps to be followed under the Classified Information Procedures Act, 18 U.S.C. app. 3, § 3, defense counsel objected strenuously to a continuation of Paragraph 4 of the Emergency Order which restricted dissemination by Reid's attorneys of communications from Reid to anyone. Citing national security concerns, the Court demurred.

Still, the argument made by defense counsel resonated, and both parties agreed at that hearing that the government had never sought such a sweeping restriction. Indeed, for years I have taught trial lawyers that:

> When you get a case, shop your ideas. Ask someone, "What about this? ... Have you ever had a case where ... ? What if I argued ... ? How do you think this would work?" This is still a profession.

William G. Young, *Reflections of a Trial Judge* 102 (1998). Paragraph 4 prevented precisely this type of trial preparation generally deemed necessary for a proper defense.

On May 7, 2002, Reid moved to dissolve the protective order placing limits upon counsel's disclosure of information received from him. The Court established a briefing schedule and heard oral argument on June 3, 2002. Defense counsel launched their main attack on the blanket prohibition the Court had imposed on their dissemination of data received from Reid in order to prepare his defense. The government did not support the Court's blanket prohibition but, instead, proffered a more limited proposed protective order which, after argument, the Court adopted.

For its part, the government sought an order requiring defense counsel, as a condition of continued access to their client, to sign an affirmation that they have received the SAMs and understand that the SAMs apply to them. On this point, issue was genuinely joined. Although defense counsel had every reason to be surprised by my reversal of position (virtually ignoring the SAMs during the March emergency hearing and now acknowledging publicly—for the first time—their presumptive validity), he immediately argued that to impose any such affirmation requirement on the defense would violate Reid's Sixth Amendment right to counsel.

The Court took this aspect of the matter under advisement. From the bench, the Court modified the Emergency Order by entering the following modified order (the "June 3 Order"):

> One: Mr. Reid is not to be removed from the district without prior order of the Court.

> Two: Defense counsel for Mr. Reid are to be provided access to their client for the purpose of engaging in confidential oral conversations and exchanging written communications solely for the purpose of preparing Mr. Reid's defense and reviewing the conditions of his confinement.

> Three: Defense counsel may share the substance of their oral conversations with Mr. Reid, and the written communications sent to or received from Mr. Reid, pertaining to the substance of the charges against him, only with each other and third parties who are engaged in the preparation of Mr. Reid's defense or providing information which is necessary and helpful to that defense. Such exchange of information shall be for the sole purpose of preparing Mr. Reid's defense.

> Four: Mr. Reid's conversations and written communications with defense counsel are subject to the Procedural Statement and Security Regulations of the Massachusetts Correctional Institution at Cedar Junction for so long as Mr. Reid shall be housed there, and otherwise applicable policies or regulations of the United States Marshals Service that were in effect prior to February 19, 2002—prior to the February 19, 2002 issuance of the Special Administrative Measures in this case.

> .    .    .    .    .

> Five: ... The United States shall not require from defense counsel any specific undertaking or affirmation without express order of this Court.

> Six: Nothing herein precludes either party from moving this Court to modify the terms and conditions of this protective order or any of the SAMs deemed to be applicable.

June 3 Hr'g Tr. at 40–41 [Docket No. 64].

On June 19, 2002, the government informed the Court that it had modified the SAMs applicable to Reid to conform to the Court's order. With respect to the affirmation requirement, Reid's SAMs now state:

> a. Attorney Affirmation of Receipt of the SAM Restrictions Document—The inmate's attorney (or counsel)—individually by each if more than one—must sign an affirmation acknowledging receipt of the SAMs restrictions document, *except where such affirmation is excused, precluded, or barred by judicial determination.*

Letter from Gerard T. Leone, Jr., Associate United States Attorney, to William G. Young, app. ¶ 2(a) (June 19, 2002) (emphasis added) [hereinafter SAMs Renewal] [Docket No. 96].

## II. ANALYSIS

### A. Constitutional Limitations on Reid's SAMs

■ While I have acknowledged that Reid's SAMs are presumptively valid once he has been properly placed in the custody of the executive as a pre-trial detainee, as noted earlier, *see supra* p. 90, the executive's control is not absolute. Because pre-trial detention is an administrative procedure designed to protect both society and Reid before trial and to insure that he will be before the Court as needed, and because Reid enjoys the presumption of innocence until he is proven guilty beyond a reasonable doubt, it may not be punitive. *Bell,* 441 U.S. at 535–37, 99 S.Ct. 1861; *see also Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (noting that the Due Process Clause prohibits punishing individuals prior to a formal adjudication of guilt, but that after such an adjudication is made, the prisoner may seek relief only under the Eighth Amendment ban on cruel and unusual punishment). Additionally, the strictures of pre-trial detention may not transgress other express constitutional guarantees afforded to the pre-trial detainee. *See Bell,* 441 U.S. at 534–35, 536–37, 99 S.Ct. 1861 (evaluating conditions of confinement under the Due Process Clause only after acknowledging that there was no allegation that the conditions violated "any express guarantee of the Constitution"). Most pertinent to this case, pre-trial strictures on a detainee cannot unduly burden Reid's fundamental constitutional right to a vigorous defense by an independent attorney under the Sixth Amendment.

### B. The Affirmation Requirement is Not to Be Enforced in this Case

When I left the bench on June 3rd, I thought I had been presented with a significant constitutional question under the Sixth Amendment. Then, sixteen days later, the government backed off. Modifying the SAMs applicable to Reid, the government now makes the affirmation requirement applicable *unless* "excused, precluded, or barred by judicial determination." SAMs Renewal ¶ 2(a). As a consequence of this modification, the government subordinates its SAMs with respect to Reid to the exercise of the Court's discretion, and the constitutional issue evaporates.

Nevertheless, a decent respect for the arguments of counsel requires me to explain why, after considerable reflection, this Court (in the exercise of its discretion and not as a matter of Sixth Amendment constitutional interpretation), has determined not to require an affirmation from Owen Walker, Esq., Tamar Birckhead, Esq., and Elizabeth Prevett, Esq. Here is why: "[S]o vital is the role of the advocate that all judicial systems in the western world are today 'adversary' in the sense that parties in contention, including parties contending with the state, are entitled to be heard through independent, trained, partisan legal representatives." Marvin Frankel, *Partisan Justice* 7 (1978).

> In its classic form, the adversary system best approaches the goals which define our concept of justice through the interplay of three entirely distinct roles—the impartial fact finder, the neutral law teacher, and the zealous advocate. At its best, the impartial fact finder is able to understand the law through the skill of the neutral law teacher, is able to discern the truth through the clashing presentations of two equally prepared, zealous, and resourceful advocates, and puts the two together in common sense fashion to arrive at a judgement. Does it work? Yes it does—better than any

other system of justice ever devised by any society anywhere on this planet.

19 William G. Young, John Pollets, and Christopher Poreda, *Massachusetts Practice: Evidence* § 102.1, 9–10 (2d ed.1998).[6]

[R]eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth. Governments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime. Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society. Similarly, there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses. That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers in criminal courts are necessities, not luxuries. The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours.

*Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (Black, J.).

Justice Stevens has said that "the citizen's right of access to the independent, private bar is itself an aspect of liberty that is of critical importance in our democracy," chiding the Supreme Court majority for "its apparent unawareness of the function of the independent lawyer as a guardian of our freedom." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 371, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (Stevens, J., dissenting); *accord Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 644, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) (Blackmun, J., dissenting); *Wheat v. United States*, 486 U.S. 153, 172, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (Stevens, J., dissenting).

The image of the zealous advocate is the model for all who engage in litigation. Meticulously prepared, aggressive yet diplomatic, lucid and persuasive in oral argument, the attorney who actually presents cases to juries and judges is still the role model for our profession, however small the percentage of the bar who actually engage in the endeavor.

To the more obvious attributes of the trial attorney one more ought be added. Second only to the duty to one's client, a lawyer is first and foremost a *teacher*.

The most pervasive and practical law teaching done in America today comes not from America's law professors, though this may surprise them. Nor does it come from the judiciary, although its declaration of publicly held values is as necessary today as at any time in our history. No—the most effective teachers of practical law in today's society are our attorneys. Indeed, the law teaching, law explaining function lies at the very heart of the legal profession. When an attorney drafts a will, negotiates a contract, forecloses a mortgage, or counsels a client in any of a myriad of ways, he is explaining—in

---

**6.** *See also id.* at 10 n. 14 ("Despite the broadside language, remember that the claim is but a comparative one. We are a long way from utopia. Indeed, like Churchill's view of democracy, the adversary system is probably the worst system ever devised for settling our differences 'except for all those other forms that have ever been tried from time to time.' Still, what right have I to make such a sweeping claim? None, really, save only that it is my earnest belief and life's work to make it so. You must judge for yourself.")

practical effect, teaching—how the law actually works.

It is a profoundly conservative measure of our society that we delegate to our legal profession almost exclusively this law teaching function. Yet, so complex have our societal relations become that only the lawyers are widely believed to have the ability to understand how the law works in actual practice.

In addition to functioning as the practical law teacher of our society, those attorneys who act as trial lawyers have an additional and nearly as important societal function to serve. Trial lawyers are the translators of the most complex, post industrial society the world has ever seen into the simple, accurate, and understandable terms with which it must be grasped by that aspect of direct democracy known as the petite jury. In a very real sense, vigorous advocates though they must be, our trial attorneys stand as the surest guardian of our jury system. Without the ability to translate the world into terms with which the jury can deal, the very premises of our system begin to yield and, with them, the moral authority of the judiciary as a coequal branch of government. We start, then, with the premise that the trial lawyer is the nation's preeminent practical law professor and its most indispensable fact interpreter.

19 Young et al., *supra* at 92–93.

Everywhere democratic and constitutional government is tragically dependent on voluntary and understanding cooperation in the maintenance of its fundamental processes and forms. It is the lawyer's duty to preserve and ad-vance this indispensable cooperation by keeping alive the willingness to engage in it and by imparting the understanding necessary to give it direction and effectiveness.

Lon L. Fuller, *The Forms and Limits of Adjudication*, 92 Harv. L.Rev. 353, 384–85 (1978).

The independent bar praised by this lyric prose is a bar truly independent of the government. It is for this reason that the conduct of the legal profession is regulated, almost entirely,[7] by the judiciaries of the several states and not by the federal or state executive branches. So long as a member of the bar conducts her practice within these ethical requirements, she may practice law free from government pressure of any kind.

■ The affirmation here unilaterally imposed by the Marshals Service as a condition of the free exercise of Reid's Sixth Amendment right to consult with his attorneys fundamentally and impermissibly intrudes on the proper role of defense counsel. They are zealously to defend Reid to the best of their professional skill without the necessity of affirming their bona fides to the government. As trusted officers of this Court, in their representation of Reid they are subordinate to the existing laws, rules of court, ethical requirements, and case-specific orders of this Court—and to nothing and no one else. If the government feels the need for specific protective orders applicable to all counsel alike, it may make application to the Court.

■ Nor is this all. The Court takes judicial notice, pursuant to Federal Rule of Evidence 201, that the government has

**7.** This qualification is necessary because, notwithstanding the McDade Amendment, 28 U.S.C. § 530B(a), subjecting federal prosecutors to the ethical requirements of the states in which they serve, federal prosecutors in New England are, in certain respects, free from such ethical restraints. *See Stern v. United States District Court*, 214 F.3d 4, 19–21 (1st Cir.2000).

indicted attorney Lynne Stewart, Esq., *inter alia*, for violating 18 U.S.C. § 1001, in that having signed the required affirmation, she violated the SAMs applicable to one Sheikh Abdel Rahman, and therefore knowingly made a false statement. *See* Indictment ¶ 30, *United States v. Sattar*, Criminal Action No. 02–395 (S.D.N.Y. Apr. 8, 2002), *available at* http://news. findlaw.com/hdocs/docs/ terrorism/ussattar 040902ind.pdf. Evidently, the government theorizes that the affirmation was knowingly false when made.[8] Whatever the merits of this indictment, its chilling effect on those courageous attorneys who represent society's most despised outcasts cannot be gainsaid. It is worth remembering that John Adams represented the British soldiers who allegedly committed the Boston Massacre. David McCullough, *John Adams* 66 (2001) (noting that, upon learning that no one else would represent the soldiers, John Adams took the case, saying "no man in a free country should be denied the right to counsel and a fair trial"); Hiller B. Zobel, *The Boston Massacre* 220 (1970). Here, where the government does not insist on a constitutional showdown, it is simply a matter of judicial prudence to avoid the affirmation issue and proceed by court orders applicable to all counsel alike. Given the importance of an independent bar to our system of democracy, this course of action becomes even more advisable.

The lack of understanding of the value of the principled advocate in American society is reflected in the fact that one of the lines virtually guaranteed to bring a laugh in America is the Shakespearean quote, "let's kill all the lawyers."

The irony of the "kill all the lawyers" proposition is that the quotation actually reflects the system-preserving characteristics of the legal profession and the knowledge that lawyers are a barrier against insurrection. William Kovacic describes a very different perspective on "kill all the lawyers" than exists in popular anti-lawyer discourse. He relates the experience of listening to an American speaker using the line unsuccessfully as a joke at the beginning of his speech. The speaker wondered why the Eastern European audience simply looked at him rather than laughing. Kovacic tells what followed.

A young Ukrainian lawyer immediately stood up and spoke. He said that he read and enjoyed Shakespeare, but doubted that this fragment of Henry VI, Part II was a suitable prescription for Ukraine. To explain, the lawyer recounted the context of the line. The famed proposal is uttered by Dick the Butcher during the gathering of a gang that wants to impose tyrannical rule by its leader, John Cade. The gang seeks to seize wealth by force and redistribute it, to have the state sell goods at a fraction of their cost, and to hang those who can read and write. Killing all the lawyers is only the first step toward liquidating anyone whose obsession with rules and reason might block the gang's ascent. After recreating the literary setting, the Ukrainian posed a question. "In this century," he said, "the Soviet Union did what Dick the Butcher wanted. We

---

**8.** While the indictment is unclear on this point, if the government complains only that she violated her affirmation and that this violation transgresses 28 U.S.C. § 1001, serious constitutional issues might arise in that the Attorney General would himself be criminalizing a variety of conduct by imposing the SAMs and then seeking indictments for their violation. It is constitutional bedrock that only the Congress can enact federal criminal statutes. *See, e.g., United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 490, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001).

killed many lawyers. We killed laws that disperse power. We destroyed people with independent ideas. We elevated tyrants. Why do Americans ridicule institutions that have helped protect personal freedom and create economic prosperity?" The businessman watched silently, swamped by waves of nodding heads.

David Barnhizer, *Princes of Darkness and Angels of Light: The Soul of the American Lawyer*, 14 Notre Dame J.L. Ethics & Pub. Pol'y 371, 402–03 (2000) (citing William E. Kovacic, *Recent Development: The Competition Policy Entrepreneur and Law Reform in Formerly Communist and Socialist Countries*, 11 Am. U.J. Int'l L. & Pol'y 437, 463 (1996)). Barnhizer reminds us that "[l]awyers who are attempting to serve what would normally be considered public interest ends are among the most vulnerable" to scorn, if not threats and even violence. *Id.* at 402 n. 82. One need only look to other societies that lack an independent bar in order to appreciate the importance of the independent bar in this country. *See generally, e.g.,* Adam Abdelmoula, *Libya: The Control of Lawyers by the State*, 17 J. Legal Prof. 55 (1992) (outlining while decrying state control over the practice of law in Libya as "one expression of the absence of fundamental rights, democracy, and lack of respect for the country's international obligations."). As one commentator put it, "we should listen ... to those around the world who aspire to the legal system we in America have, because that system has contributed to a level of freedom, of stability, and of material well-being that rightly are the envy of the world." Ronald A. Cass, *The Rule of Law* 151 (2001).

## C. The "Do Not Move Him" Order

■ The final sentence of paragraph 1 of the Emergency Order provides: "The defendant is not to be moved within the district or without the district without the prior permission of this Court." Although entered in haste on March 25, 2002, as part of the emergency order, this mandate has not been the source of objection by any party and the Court continued it in effect in its June 3 Order. Now, however, the Court vacates this aspect of its order *sua sponte*. An explanation is in order.

### 1. Why Was the "Do Not Move Him" Order Entered?

On March 25, 2002, after learning that the government had cut off all communication between Reid and his defense counsel, the Court recognized that it faced an emergency situation that demanded immediate action. Candidly, I also feared that this measure could be but a prelude to the President[9] removing Reid from the territorial jurisdiction of this Court and turning him over to a military tribunal. It was to frustrate—or at least impede—this possibility that the emergency "do not move him" order entered.

Time has passed. The President has taken no such action. Indeed, the government has promptly and properly discharged all its ethical and litigation obli-

---

9. A note on style: usually judges write in the third person, i.e., "the Court," and refer to the executive branch impersonally as "the government." Here, I write personally when revealing my own human mistakes and adopt "the Court" usage when—I believe accurately—delineating the law. I refer directly to the President since it appears under the applicable executive order that it is he who decides who is to be tried by military tribunal. *See* Executive Order, § 2(a) ("The term 'individual subject to this order' shall mean any individual who is not a United States citizen with respect to whom *I determine* from time to time in a writing" engages in acts of terrorism or harbors those who do (emphasis added)).

gations, vigorously advancing its legal interests in a completely professional fashion. It appears this case is headed for trial before an American jury. Reflecting on the emergency order, I have posed to myself the following questions and given the following answers.

Is the feared scenario possible? Yes.

Is the order effective? Not really.

Is the order wise? No.

These points are considered below.

### 2. *Is the Feared Scenario Possible?*

While the current fluid situation with respect to the war on terrorism seems, within the United States at least, more closely to resemble Indiana during the Civil War, *Ex Parte Milligan,* 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281 (1866), than the classic World War II spy saboteur scenario at the height of the battle for the Atlantic, *Ex Parte Quirin,* 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942); *see generally* Samuel Eliot Morison, *History of United States Naval Operations in World War II: The Battle of the Atlantic, Sept. 1939—May 1943,* 200 (1947), it is no part of this Memorandum to comment on the legality of the current military tribunal apparatus. No such issue is before me, and this Memorandum assumes that military tribunals are entirely constitutional and lawful.[10]

If so, Reid would seem to be a prime candidate for such a tribunal. If the government allegations are to be believed, Reid—a non-citizen operative of an international terrorist organization—was taken, if not with arms in his hands, with bombs in his shoes in the act of attempting to murder 197 innocent non-combatants. These murders would have furthered no

military ends—they would have served only to inflict pain and sorrow and to terrorize other innocents. Such conduct appears to violate the somewhat inchoate laws of war as well as a number of discrete United States statutes.

In the instant case, however, the government has chosen to present its evidence to an American grand jury here in the District of Massachusetts. The persons sitting on that grand jury have returned an indictment in the normal form, Reid has been arraigned on that indictment, and this case is proceeding apace, the parties vigorously and professionally contesting various pre-trial matters, all in the form normal for a serious criminal case pending in a United States District Court. Even without the "do not move him" order, it would seem incredible that the President could now have Reid seized, taken beyond this Court's territorial jurisdiction, and placed before a military tribunal. And yet . . .

### 3. *Is the Order Effective?*

The simple fact is that, were the President to revisit the issue, he could easily obtain complete control of Reid by dropping the present charges in this Court without prejudice and then proceeding before a military tribunal. United States Attorneys drop charges all the time, usually as part of a charge bargain for a guilty plea to a lesser charge, even though such charges have been returned by duly impaneled grand juries. *See, e.g.,* Plea Agreement, *United States v. Lindh,* Criminal Action No. 02–37A, 2002 WL 1592526 (E.D.Va. July 15, 2002), *available at* http://news. findlaw.com/hdocs/docs/terrorism/us-

---

**10.** This assumption is a hotly contested one, particularly within the legal academy. *Compare, e.g.,* Curtis A. Bradley & Jack L. Goldsmith, *The Constitutional Validity of Military Commissions,* 5 Green Bag 249 (2002) (arguing that the Executive Order is constitutional and lawful), *with* Neal K. Katyal & Lawrence H. Tribe, *Waging War, Deciding Guilt: Trying the Military Tribunals,* 111 Yale L.J. 1259 (2002) (arguing that it is not).

lindh71502pleaag.pdf; *Berthoff v. United States*, 140 F.Supp.2d 50, 61–62 (D.Mass. 2001). The dropping of the charges, of course, concludes the case and this Court's jurisdiction—limited as it is under the United States Constitution to actual cases or controversies, U.S. Const. art. III, § 2—ceases, and with it the "do not move him" order.

■ It is true that under Federal Rule of Criminal Procedure 48(a), the government cannot drop these charges without "leave of court." Like all the rules passed under the Rules Enabling Act, 28 U.S.C. § 2072, this rule carries the force of law. *Id.* At common law, however, the right of the government to drop charges was absolutely unfettered. *The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457, 19 L.Ed. 196 (1868); *Baglioni v. Chief of Police*, 421 Mass. 229, 232, 656 N.E.2d 1223 (1995). This was changed by insertion of the "leave of court" requirement of Rule 48,

which "was intended to modify and condition the absolute power of the Executive [to dismiss a case], consistently with the Framer's concept of Separation of Powers, by erecting a check on the *abuse* of executive prerogatives." *United States v. Cowan*, 524 F.2d 504, 513 (5th Cir.1975) (emphasis added). The Supreme Court has noted that the "principal object" of this requirement is "to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Rinaldi v. United States*, 434 U.S. 22, 29 n. 15, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977).

Were the President to seek to transfer Reid for trial before a military tribunal, it would be utterly unprecedented for a judge to invoke Rule 48 and condition the dismissal on a "with prejudice" disposition. We live in times that are utterly unprecedented,[11] of course, and Reid's right to

---

**11.** Remarkably, the press today blandly refers to "military detention" as simply a "parallel track" to being "indicted in the federal court system." Thanassis Cambanis, *New Federal Security Act Remains Largely Unused*, Boston Globe, June 23, 2002, at B1. Indeed, the very act of creating the apparatus for trials before military tribunals, even though it has not yet—so far as the public has been told—been engaged, has the effect of diminishing the American jury, once the central feature of American justice, to nothing more than a "parallel track." *See* Adam Liptak, *Accord Suggests U.S. Prefers to Avoid Courts*, N.Y. Times, July 16, 2002, at A14.

This is the most profound shift in our legal institutions in my lifetime and—most remarkable of all—it has taken place without engaging any broad public interest whatsoever.

This result ought not surprise us, for the American jury system is dying out—more rapidly on the civil than on the criminal side of the courts and more rapidly in the federal than in the state courts—but dying nonetheless.

· For decades, our civil juries have been incessantly disparaged by business and insurance interests without the courts offering any

defense of the single institution upon which their moral authority ultimately depends, *but see Ciulla v. Rigny*, 89 F.Supp.2d 97, 100–03 (D.Mass.2000) (offering such a defense), with the predictable result that bipartisan majorities in the Congress have severely restricted access to the American jury. *See, e.g.*, Employee Retirement and Income Security Act, 29 U.S.C. § 1001 *et seq.*; *Andrews–Clarke v. Travelers Ins. Co.*, 984 F.Supp. 49, 63 n. 47 (D.Mass.1997); Private Securities Litigation Reform Act, 15 U.S.C. § 78u *et seq.*; *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 271 n. 3 (D.Mass.1998). These interests know what they are doing. The most sophisticated recent analysis has led one commentator to conclude, "a civil justice system without a jury would evolve in a way that more reliably serve[s] the elite and business interests." Valerie P. Hans, *Business on Trial: The Civil Jury and Corporate Responsibility* 226–27 (2000).

Indeed, institutionally federal courts today seem little concerned with jury trials, *see* Edmund V. Ludwig, *The Changing Role of the Trial Judge*, 85 Judicature 216, 216, 217 (2002) ("Trials, to an increasing extent, have become a societal luxury ... [although] when

receive a trial by a fair and impartial jury cannot truly be guaranteed until that jury is sworn and Reid's rights under Double Jeopardy Clause of the Constitution attach. U.S. Const. amend. V; *Serfass v. United States*, 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975).

### 4. *Is the Order Wise?*

In this case, the President and the President's attorneys have sought a formal indictment and jury trial of Reid. It is readily apparent that they have done so due to the fact that the American jury is direct democracy in action, the New England town meeting writ large. By subjecting their case to the requirements of formal proof beyond a reasonable doubt in a public courtroom before a jury of ordinary Americans, the government invigorates and strengthens our democracy generally as can no other form of trial and demon-

strates to the world at large its absolute faith in the strength and independence of our institutions. In fine, here the President is taking his case directly to the people.

In the face of such obvious faith in our fundamental institutions, the "do not move him" order—entered in haste—is, on careful reflection, unworthy of this Court. It ought be, therefore, and hereby is, vacated. Refined by two centuries of practice, an American jury, this "stunning experiment in direct popular rule",[12] will try this case.

### III. CONCLUSION

Accordingly, the Court's Emergency Order of March 25, 2002, as modified on April 22, 2002, and June 3, 2002, is VACATED with respect to its order that Reid may not be removed from this jurisdiction without

---

cases are handled as a package or a group instead of one at a time, it is hard, if not impossible, for the lawyers or the judges to maintain time-honored concepts of due process and the adversary system." (Judge Ludwig is a member of the Court Administration and Case Management Committee of United States Judicial Conference)). Moreover, the federal judiciary has been willing "to accept a diminished, less representative, and thus sharply less effective civil jury." *Ciulla* 89 F.Supp.2d at 102 n. 6 (citing Judith Resnik, *Changing Practices, Changing Rules: Judicial and Congressional Rulemaking on Civil Juries, Civil Justice and Civil Judging*, 49 Ala. L.Rev. 133, 137–52 (1997) (decrying the failure of the Judicial Conference to restore twelve-person juries in civil cases), and *Developments in the Law—The Civil Jury*, 110 Harv. L.Rev. 1408, 1466–89 (1997) (same)); *see also* Am. Coll. of Trial Lawyers, *Report on the Importance of the Twelve-Member Civil Jury in the Federal Courts* (2001), *available at* http://www.actl.com/PDFs/Importance12MemberJury.pdf.

On the criminal side of our federal courts, manipulation of the United States Sentencing Guidelines has the consequence of imposing savage sentences upon those who request the

jury trial guaranteed them under the United States Constitution, 500% longer than sentences received by those who plead guilty and cooperate. *Berthoff*, 140 F.Supp.2d at 67–68. Small wonder that the rate of criminal jury trials in the federal courts is plummeting. *Id.* at 69 n. 34.

It is the saddest irony that the government offers as one of its justifications for the creation of secret military tribunals sitting in remote locations the protection of jurors who would be unwilling to serve in such cases, *see* Elisabeth Bumiller & David Johnston, *Bush Sets Option of Military Trials in Terrorist Cases*, N.Y. Times, Nov. 14, 2001, at A1 ("White House officials said the tribunals were necessary to protect potential American jurors from the danger of passing judgment on accused terrorists."), precisely at the moment that average Americans were turning out in record numbers to perform the sole civic duty prescribed in the Constitution—jury service, Thanassis Cambanis, *Juror Scrutiny Reaches New Level*, Boston Globe, July 12, 2002, at B1.

12. *Lirette*, 27 F.Supp.2d at 271 (citing Alexis de Tocqueville, *Democracy in America* 337–39 (Schocken 1st ed.1961)).

the prior order of this Court. As the government has conceded in its renewal of the SAMs, Reid's attorneys are not required to sign any affirmation that they will abide by the SAMs or a receipt of their acknowledgment where this Court has barred such an affirmation. SAMs Renewal ¶ 2(a). Insofar as the Emergency Order placed limitations on attorney-client communications, as explained previously, the Emergency Order was modified on June 3, 2002, to remove the limits it imposed upon counsel's disclosure of information received from Reid and its limitations upon the people with whom Reid could communicate as part of his defense. This modification stands and Reid's Sixth Amendment rights are thereby fully vindicated. In all other respects, the existing SAMs apply to Reid and his counsel; in addition, all otherwise applicable policies or regulations of the United States Marshals Service in effect at MCI/Cedar Junction that were in effect prior to February 19, 2002—prior to the February 19, 2002 issuance of the SAMs in this case, are applicable to Reid so long as he shall be housed there pending trial.

SO ORDERED.